**SIGNED THIS: May 31, 2019**

_____
**Thomas L. Perkins
United States Bankruptcy Judge**

**UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| DYLAN McCURDY, | ) | Case No. 17-80033 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| FRED CLARK and DONNA CLARK, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Adv. No. 17-8016 |
| | ) | |
| DYLAN McCURDY, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

This matter is before the Court following a trial on the amended complaint filed by Fred and Donna Clark, Plaintiffs, against Dylan McCurdy, the Debtor, seeking to establish a debt under the Illinois Home Repair and Remodeling Act and a determination that such debt is nondischargeable pursuant to section 523(a)(2)(A) under the Bankruptcy Code.

1

**Factual Background**

In 2014, when the Plaintiffs were living in Hersman Illinois, they met the Debtor, who was also living in Hersman at that time, when he assisted his father-in-law in laying linoleum in the Plaintiffs' residence. Thereafter, the Plaintiffs became friends with the Debtor and his wife and the couples enjoyed a companionable relationship, sharing meals and enjoying leisure time together. The Plaintiffs hired the Debtor to convert their garage to living space, putting up studs and dry wall, including building a closet, putting in a bathroom and performing the necessary electrical work. The Debtor was also building a storage shed for the Plaintiffs with material that was at their house. In exchange, the Plaintiffs gave the Debtor a Ford tractor and a Jeep. The Debtor moved to Plymouth, which was approximately forty-five miles away, prior to the work being completed. Given the distance, Fred Clark testified that he did not expect the Debtor to finish those projects. Fred testified that the quality of the work performed at his Hersman house by the Debtor was "fine," albeit not completed.

In May 2015, the Plaintiffs purchased a house in Plymouth, where the Debtor was then residing. The Plaintiffs wanted to make improvements to the home and remodel the kitchen. The house had a galley kitchen and Donna wanted to expand it. The Plaintiffs and the Debtor began to discuss different plans for the project. The Debtor visited the house and the parties continued to exchange ideas for the house over the ensuing month. The Plaintiffs initially hired the Debtor to put in new flooring and wainscoting in the pool table room, which adjoined the kitchen. In late June 2015, the parties reached a verbal agreement for the remodeling work to be done in the kitchen, which included a redesign and construction of the kitchen cabinets with knotty alder wood, new flooring in the kitchen, and some trim throughout the house. Fred testified that he did not ask the Debtor for a written contract because he "just trusted him."

The parties' agreement included the installation of a HVAC heat pump as the house had no furnace. The project involved some plumbing, which would necessitate the hiring of a subcontractor, and also electrical work, which the Debtor intended to perform himself. Other than a rough, hand-drawn sketch of the cabinet layout, no written proposal was submitted by the Debtor. Near the end of June, the Debtor quoted the Plaintiffs, who were still living in Hersman at that time, a price of $30,000, but gave no time frame for completion of the work. The Plaintiffs delivered a check to the Debtor for $30,000 on June 29, 2015, in payment of the total project cost, and the keys to the house in order that he could get started. The Debtor testified that he was unaware of any legal requirement to use a written contract, to insure the project or to supply a consumer rights brochure.

The Debtor began work on the project on July 6, 2015 and was assisted by a helper, Kendal Hill. The Debtor's time sheets, admitted into evidence without objection, indicate that the Debtor worked 45 hours on the project and Kendal worked 40 hours from July 6 through July 10. The time sheet for the following week indicates that the Debtor worked 19 hours from July 13 through July 16 and that Kendal did not work at all that week. The Debtor testified that he stopped working on the Plaintiffs' house after those first two weeks because he had other projects to complete, and he believed the Plaintiffs' job could wait because they had not moved into the property yet.

The Debtor began by tearing out the carpet in the pool room and installing a laminate floor. He then started the demolition work in the kitchen, beginning with removal of the floor and then the cabinets. The Debtor next began the framing for the pantry off the kitchen, which included a pre-framed pocket door. The Debtor removed the dry wall, framing the pass-through

3

between the pool room and the kitchen. As part of the demolition, the Debtor took out a bar with cabinets up above, making the dining and kitchen area one larger space. The Debtor capped the exposed plumbing, but exposed wiring was left hanging from the ceiling and the wall according to Fred.

In July 2015, the Debtor hired an HVAC technician, All Seasons Heating in Versailles, IL, to provide and install the new heating/cooling system including the heat pump, air handler, new ductwork and floor registers. The Debtor paid All Seasons its full contract price of $6,421 in two payments, $3,250 on July 18, 2015 and $3,171 on August 21, 2015, from the funds received from the Plaintiffs. The HVAC installation was completed as of August 24, 2015, per All Seasons' invoice, which was admitted into evidence along with other invoices and receipts for materials purchased.

In early August 2015, after obtaining Donna Clark's approval as to the make and model, the Debtor purchased new kitchen appliances from Sears, for $4,133. These included a double wall oven, dishwasher, cook top and refrigerator, all of which were delivered to and stored in the garage of Plaintiffs' house. The Debtor made the purchase using his mother-in-law's Sears MasterCard to obtain a discount on the total cost of the appliances. He reimbursed his mother-in-law in full on August 14, 2015, presumably using the funds provided by the Plaintiffs.

Also in August 2015, the Debtor purchased the wood for the cabinets and materials from Menards that he would need to construct and stain the cabinets, as well as $276 worth of tools from Harbor Freight Tools. In late August and early September 2015, the Debtor purchased more materials from Menards for the project relating to the electrical work that needed to be done. In mid-September 2015, the Debtor purchased additional carpentry materials for the project. The

4

Debtor finished approximately half of the flooring in the kitchen and had begun building the frame work for the cabinets.

The Debtor produced no time sheets for August or September 2015, indicating that no substantial work was performed at the property during that period by the Debtor or any helper. According to his testimony, the Debtor stopped working on the Plaintiffs' home for a time because he was occupied by other projects. Because the Plaintiffs were still living in Hersman when the work began, the Debtor believed they were not in any hurry for him to complete the job. That changed, however, when the Plaintiffs moved into the home in August 2015, after the demolition had been completed, at which point the kitchen was unusable. Fred told the Debtor that they would like to have the kitchen finished by Thanksgiving. On September 14, the Plaintiffs gave the Debtor an additional $3,000, hoping to spur the project toward completion.

Dissatisfied with the lack of progress as time went on, Fred kept after the Debtor, repeatedly inquiring of the status of the project. Fred would go the Debtor's house or confront him around the town, inquiring when the work would be completed. The Debtor would tell him that he was "working on it," promising him that he would return and resume work. The Debtor's times sheets indicate that the Debtor returned to the job site on October 7, 2015 with a different helper, Kyle Thompson. They worked parts of five days that week through October 11, with the Debtor logging 30 hours and Kyle 20 hours on the project. The time sheets indicate that they spent the afternoon of October 9 leveling the house, due to the floor in the pool room having sagged, by installing bracing in the crawl space.

Eight more days went by with no one at the job site. According to the time sheets, the Debtor and Kyle returned on October 19 and worked for five straight days that week, with the

5

Debtor logging 30 hours and Kyle 20 hours. The Debtor purchased more materials for the project from Menards on October 20 and 28.

The pressure on the Debtor continued to mount, from both the Plaintiffs' demands and those of his other customers. Eventually, Fred cornered the Debtor, questioning whether he was "in over his head" and needed additional help in getting the work completed. Finally, on November 1, 2015, with Fred present at the house, the Debtor packed up his tools and left, abandoning the project. The Debtor testified that he wanted to finish the job but felt he could not meet the Plaintiffs' Thanksgiving deadline. The Debtor testified that he was also very aware that the problems with the project were leading to a breakdown of his friendship with the Plaintiffs, so he decided to walk off the job and let someone else finish it. The Debtor refused Fred's urging that they attempt to resolve the matter amicably. The Debtor did not refund any of the contract price to the Plaintiffs, sending an itemized accounting of time spent and materials purchased, within days of leaving the job site. The total amount of the itemization is $32,282.83.

The Plaintiffs hired Bradley Scott Hatfield, the owner of a heating and air conditioning business in Augusta, Illinois, to complete some of the unfinished work. Faced with the bare and nonfunctioning kitchen, Hatfield worked at the house for three weeks, beginning in late November 2015. He finished the drywall and floor in the kitchen, reengineered electrical circuits and redesigned electrical outlets, tore down a wall, stubbed in and hooked up the plumbing, and installed the appliances. Hatfield charged the Plaintiffs $4,400 for his work, which included a minor amount of work done on the bedrooms that had not been included in the scope of the Debtor's work. The Plaintiffs paid Hilltop Woodworking the sum of $8,215 to complete and install the kitchen cabinets and the sum of $1,738.75 for custom countertops. The Plaintiffs also paid $3,224 to John Kemp to complete installation of the doors and to put up drywall, identifying

6

the work done as part of the original contract with Debtor. Fred testified that the work completed by others was done in accordance with the original plan, with no changes other than minor alterations necessitated as the work progressed. In early 2016, the Plaintiffs brought suit against the Debtor in state court in Hancock County.

The Debtor filed a Chapter 7 petition on January 10, 2017, referencing the pending state lawsuit, which had not gone to judgment, and scheduling the Plaintiffs as unsecured creditors holding a claim for $30,000. The Plaintiffs filed this adversary complaint, seeking a determination that their debt is not dischargeable and requesting attorney fees, costs and punitive damages. The Debtor's motion to dismiss the complaint, alleging that it stated only a state law claim for breach of contract for Debtor's alleged failure to complete the contract, was granted by the Court with leave to amend.

The amended complaint, brought under section 523(a)(2)(A), alleged both a traditional fraud theory in Count I and a form of presumptive fraud arising from a violation of the Illinois Home Repair and Remodeling Act in Count II. In response, the Debtor filed an answer to Count I but sought dismissal of Count II, based upon the Illinois statute, asserting that the Court lacked jurisdiction to consider an action brought under that provision and, further, that a violation of the state statute was not a sufficient basis to establish the nondischargeability of the Plaintiffs' claim. As later discussed, the motion to dismiss was denied, and the matter proceeded toward trial. The Debtor filed an answer, not admitting to any debt owing to the Plaintiffs, and further denying the dischargeability of any such debt and denying liability under the Illinois statute. Trial was held on January 8, 2019, and the matter was taken under advisement. Post-trial briefs were submitted by both parties and have been considered by the Court.

**Analysis**

7

As explained by the Court in denying the Debtor's motion to dismiss Count II of the amended complaint, a determination regarding the dischargeability of a debt involves a two-step process: (1) the establishment of the debt owed the creditor under applicable nonbankruptcy law and (2) a determination whether the debt is nondischargeable under section 523(a) of the Bankruptcy Code. When a complaint to determine the dischargeability of a debt is before the bankruptcy court prior to the entry of a judgment in a nonbankruptcy forum, as is the case here, the bankruptcy court must necessarily determine liability and damages in order to establish the underlying debt.

The Debtor does not dispute that an oral contract existed between the parties, though he does not admit liability to the Plaintiffs. The Debtor submitted a work log and a collection of invoices and receipts in an attempt to show that his expenses, including compensation for his labor and that of his helpers, equaled the contract's cost. The contract here, however, was not on a time-and-materials basis but a flat-rate price. Under Illinois law, when there has been a breach of a construction contract based upon defective workmanship or a failure to provide full performance, the measure of damages is the cost of repairing the defects and/or completing the contract. *Fieldcrest Builders, Inc. v. Antonucci,* 311 Ill.App.3d 597, 607 (1 Dist. 1999); *Arch of Illinois v. S.K. George Painting Contractors, Inc.,* 288 Ill.App.3d 1080, 1082 (5 Dist. 1997).

The Plaintiffs contended in the amended complaint that the work that the Debtor had failed to perform under the contract was completed at a cost of $28,282.75. At trial, however, the Plaintiffs' evidence of additional payments made to other entities was limited to $17,577.75. In addition to that amount, the Plaintiffs claim that they are entitled to attorney fees, costs, and punitive damages. The Plaintiffs testified that they have paid attorney fees of $12,350. In their post-trial brief, the Plaintiffs compute their actual damages to be $40,632.75, consisting of the

8

sum of $28,282.75 claimed to have been paid to other contractors to complete the work and $12,350 in attorney fees. They also ask for an award of punitive damages of $81,265.50, representing twice the amount of actual damages.

With respect to attorney fees, Illinois follows the "American Rule," that absent statutory authority or a fee-shifting provision in a contractual agreement between the parties, each party to litigation must bear its own attorney fees and costs and may not recover those fees and costs from an adversary. *Morris B. Chapman & Assoc., Ltd. v. Kitzman,* 193 Ill.2d 560, 572 (2000). The American Rule is applied in federal litigation, including litigation in bankruptcy courts. *Matter of Sheridan,* 105 F.3d 1164, 1166 (7th Cir. 1997) (noting the absence of a general fee-shifting provision in §523(a) of the Bankruptcy Code).

Attempting to establish an entitlement to attorney fees and punitive damages, the Plaintiffs assert that the Debtor violated the Illinois Home Repair and Remodeling Act (Home Repair Act). 815 ILCS 513/1 *et. seq.* Specifically, the Plaintiffs point to the Debtor's failure to obtain a signed contract, his failure to provide them with a copy of a consumer rights brochure prepared by the Attorney General's office, and his failure to obtain insurance for the project, as required by sections 15, 20, and 25, respectively, of the Home Repair Act. The Debtor credibly testified he was unaware of these requirements. Relying on section 35(b) of the Home Repair Act which provides that "any violation of this Act shall constitute a violation of the Consumer Fraud and Deceptive Business Practices Act," the Plaintiffs contend that those violations entitle them to attorney fees, costs and punitive damages under section 10(a) of the Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act), 815 ILCS 505/10a(a).

As pointed out by the Debtor, however, the Plaintiffs' analysis of the Illinois statutes is flawed. As has been recognized, the legislative purpose of the Home Repair Act is to enable the

9

Attorney General and the State's Attorney to correct a potentially harmful practice. *Fandel v. Allen*, 398 Ill.App.3d 177 (3 Dist. 2010). Section 10(a) of the Consumer Fraud Act permits a person who suffers actual damage resulting from a violation of the Consumer Fraud Act to bring an action against the person committing the violation. In other words, the Plaintiffs would be entitled to bring suit under the Consumer Fraud Act for any actual damages suffered as a result of Debtor's failure to comply with sections 15, 20, or 25 of the Home Repair Act. See *Fandel.*

Although a violation of the Consumer Fraud Act may occur in the absence of actual damages, that kind of technical violation may be prosecuted only by the Attorney General. For a consumer to pursue a private cause of action under the Consumer Fraud Act, the violation itself must have caused harm to the consumer. *Duran v. Leslie Oldsmobile, Inc.,* 229 Ill.App.3d 1032, 1040 (2 Dist. 1992); *Burkhart v. Wolf Motors of Naperville, Inc.,* 2016 IL App (2d) 151053, ¶24. With respect to the private right of action, the statute does not impose *per se* liability. Only a party actually harmed by the conduct that is a violation of the Consumer Fraud Act has standing to bring a private action. *Xydakis v. Target, Inc.,* 333 F.Supp.2d 686, 688 (N.D. Ill. 2004). Because innocent misrepresentations are actionable under the Consumer Fraud Act, damages will not be presumed. *Duran,* 229 Ill.App.3d at 1040-41. Since it is the conduct that constitutes a violation under the statute that must have caused the harm to the plaintiff, ordinary breach of contract damages are usually insufficient to meet the causation requirement. See *Zankle v. Queen Anne Landscaping,* 311 Ill.App.3d 308, 312-13 (2 Dist. 2000).

The Plaintiffs did not allege, nor did they present any proof, that they suffered any actual damages proximately caused by the Debtor's failure to obtain a signed contract, to provide them with a copy of the consumer rights brochure, or to obtain insurance for the project. Absent such proof, a claim under the Consumer Fraud Act cannot be established. See *Heartland Const.*

10

*Group, Inc. v. Nelson*, 2011 WL 9753790 (Ill. App. 1 Dist.) (technical violations of Home Repair Act insufficient for claim under Consumer Fraud Act where consumers failed to allege damages suffered as a result of the Home Repair Act violations). Since the Consumer Fraud Act is the sole theory asserted by the Plaintiffs for awarding attorney fees and punitive damages, those claims must be denied. The only damages to which the Plaintiffs are entitled are ordinary breach of contract damages. Therefore, the Debtor is entitled to Judgment on Count II of the Amended Complaint.

The Plaintiffs introduced evidence at trial that they paid $17,577.75 to correct and complete the work that the Debtor agreed to perform. This evidence was not challenged by the Debtor. Accordingly, the Court determines that the Plaintiffs established a prepetition debt owed by the Debtor in the amount of $17,577.75. The Court will now turn to the determination of whether the debt is dischargeable.

Section 523(a)(2)(A) excepts from discharge a debt for money "to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. §523(a)(2)(A). To prevail under this provision, a creditor must show that (1) the debtor made a false representation or omission, (2) that the debtor (a) knew was false or made with reckless disregard for the truth and (b) made with the intent to deceive, (3) upon which the creditor justifiably relied. *Ojeda v. Goldberg*, 599 F.3d 712, 716-17 (7th Cir. 2010). Once those elements are established, the creditor must then prove a loss proximately caused by its justifiable reliance. *Id.* at 721.

Apart from a misrepresentation of a material fact, actual fraud encompasses "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another." *McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000). In order to establish

actual fraud, a creditor must prove (1) a fraud occurred, (2) the debtor intended to defraud the creditor, and (3) the fraud created the debt that is the subject of the nondischargeability action. *Id.* The creditor bears the burden to prove each element of the claim by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279 (1991).

It is well-settled that a mere breach of contract, even an intentional breach, is not actionable under this provision. *In re Sasse*, 438 B.R. 631, 648 (Bankr. W.D. Wis. 2010); *In re Hill*, 425 B.R. 766, 775 (Bankr. W.D. N.C. 2010). Courts have recognized that a contractor's failure to perform as promised, standing alone, gives rise to a claim for breach of contract, but not actionable fraud, misrepresentation or false pretenses under section 523(a)(2)(A). *In re Barr*, 194 B.R. 1009 (Bankr. N.D. Ill. 1996). To be actionable as fraud, the plaintiff must show that the debtor entered into the contract with the intent of never complying with its terms. *In re Giquinto*, 388 B.R. 152 (Bankr. E.D. Pa. 2008). Additionally, if a debtor makes an intentional misrepresentation, such as overstating his qualifications when soliciting or obtaining the work, a subsequent breach of the contract may result in a nondischargeable debt. *In re Isaacson*, 478 B.R. 763 (Bankr. E.D. Va. 2012); *In re Barr*, 194 B.R. at 1018 (misrepresentation of prior fact may come under section 523(a)(2)(A), but a promise of future performance which is not fulfilled may not).

Where a creditor pays in advance for work to be performed in the future by a debtor who intended not to perform or knew that he would be unable to perform, the subsequent failure to perform may result in a nondischargeable debt because the debtor obtained the advance payment with a fraudulent intent. On the contrary, if advance payment is made to a debtor who is willing and able to perform, later nonperformance, while constituting a breach of the contract, will not warrant a determination of nondischargeability. This distinction gives effect to the statutory

condition that under section 523(a)(2)(A) a debt may be excepted from discharge only *to the extent obtained by* fraud.

The Plaintiffs continue to rely on the Debtor's violations of the Home Repair Act to support their contention that the Court can infer that the Debtor never intended to perform under the agreement from his failure to provide a written contract, failure to provide a copy of the consumer rights brochure, and his failure to obtain either a permit or insurance for the project. The Plaintiffs also point to the fact that the Debtor did not have all the tools necessary to perform the work, since he bought some new tools, and that he failed to consult or hire the necessary qualified subcontractors to complete the contract.

The evidence at trial fails to support the Plaintiffs' assertions that the Debtor never intended or knew that he would be unable to comply with the contract. Upon the Plaintiffs' delivery of the check for $30,000, the Debtor promptly got to work. He replaced the flooring in the pool room and removed and replaced part of the floor in the kitchen. He tore out the cabinets and the bar, disconnected and took out the existing appliances and began constructing the frame for the new cabinets. He purchased new appliances for the kitchen. He also purchased the specialty wood, knotty alder, for the making of the cabinets. In addition, the Debtor hired and fully paid an HVAC subcontractor to install the heat pump and related equipment.

Partial performance negates an inference of fraudulent intent, an intent not to keep a promise at the time it was made. *In re Isaacson*, 478 B.R. 763, 776 (Bankr. E.D. Va. 2012). The Debtor's fabrication of what turned out to be mis-sized cabinetry frame, failure to adhere to the Plaintiffs' requested completion date, which was determined after the work had begun, and his subsequent failure to complete other provisions of the contract do not constitute evidence of a fraudulent intent at the time the contract was formed and the $30,000 was paid. In fact, at trial

Fred admitted on cross-examination that it was likely that only after the Debtor had begun the work that he realized he was not capable of completing the project, or that he had spent the money that he had received from the Plaintiffs on other projects and did not have the funds to complete the job. Most telling, when asked the direct question, Fred would not say that he believed the Debtor intended to cheat the Plaintiffs from the beginning.

The Plaintiffs also contend that the Debtor misrepresented that he was qualified to undertake the remodeling project, including the cabinetry. The Plaintiffs recognize that they must prove that the Debtor intended to deceive them.  A debtor's intent to defraud is measured by a subjective standard and is ascertained by the totality of the circumstances of the case. *In re Kucera*, 373 B.R. 878 (Bankr. C.D. Ill. 2007).  The focus is upon the manner in which the debtor obtained the funds. *In re Graham*, 472 B.R. 524 (Bankr. W.D. Wis. 2012).  Subsequent conduct is only relevant to the extent that it reflects the debtor's state of mind at the time the funds were obtained. *In re Copeland*, 291 B.R. 740 (Bankr. E.D. Tenn. 2003).

When asked about alleged misrepresentations made by the Debtor, Fred testified that the Debtor described in basic terms where the cabinets would be placed and that they would be built with beveled edges.  When prodded by his attorney, Fred could not identify any specific representations made by the Debtor as to his expertise or qualifications.  Rather, Fred testified that based upon their friendship and the work that the Debtor had previously done for the Plaintiffs at their Hersman property, he trusted and had confidence in the Debtor.  Based on his previous work, Fred believed that the Debtor could capably complete the contract.  Fred testified that he trusted the Debtor based on their relationship as "good, good friends."

The Court finds that the Plaintiffs failed to establish that the Debtor made any material misrepresentation which fraudulently induced them to enter into the contract. According to the

14

Debtor's petition, he has owned a construction/carpentry business since 2003, operated as a sole proprietorship. The Debtor testified that over the years he has worked under and with other contractors, as well as partnered with other contractors, performing small bathroom and kitchen remodels. He worked for Service Master for a period of approximately five years, performing demolition and restoration work, acting as the assistant operations manager at the time he left. Before entering into the agreement with the Plaintiffs, the Debtor testified that he had constructed furniture and cabinetry for himself, but not as part of any commercial contract. The Debtor never told the Plaintiffs that he was a licensed plumber or licensed electrician, and there was no evidence that the Debtor overstated his experience building cabinetry.

  The Debtor testified that he reached the contract price of $30,000 "off the top of his head," not by undertaking a time and materials analysis. The Plaintiffs never questioned the price or asked for any information as to how it was calculated. They simply gave the Debtor a $30,000 check and later, without the Debtor asking for it, an additional $3,000 check. This is not a case where the payment was obtained in reliance on a false statement made by the Debtor. He quoted the Plaintiffs a price and they paid it without any further discussion or negotiation.

  Taking into consideration all the evidence, the Court believes that the Debtor, when entering into the contract with the Plaintiffs, intended to and believed that he could complete the project satisfactorily, including the cabinetry. He hired an HVAC contractor and anticipated hiring a plumber, but he believed he could perform the carpentry and electrical work on his own. The Court finds this belief to have been sincerely held by the Debtor. The Debtor may have breached the contract but he did not commit fraud. The evidence does not support any findings that would prove fraud, such as that the Debtor promised good work but intended all along to do defective work, or that he took the job planning to abandon it unfinished, or that he intended not

15

to finish the work or purchase the materials when he took the money. See *In re Davis,* 638 F.3d 549, 554-55 (7th Cir. 2011). Five months elapsed after the Debtor received the initial $30,000 payment, and six weeks elapsed after he received the additional $3,000 payment, before he ultimately abandoned the project on November 1, 2015. Substantial work was performed by the Debtor and his helpers. This is simply not a situation where a debtor "took the money and ran." See *In re Blair,* 2011 WL 1770307 (Bankr. N.D. Ill. 2011).

A significant fact that bolsters this conclusion is the strong friendship that the Debtor and his wife had with the Plaintiffs. Nothing in the record indicates that the Debtor was intending to cheat or take advantage of his good friends. Given the Plaintiffs' frustration in late October 2015, and the unfinished state of the kitchen, the Debtor believed it was best, given their relationship, that he leave the project in order to let the Plaintiffs hire someone who could finish it in a timely manner. It appears to the Court that the Debtor, as recognized by the Plaintiffs, had simply "bitten off more than he could chew." See *In re Kaufmann*, 57 B.R. 644, 646-47 (Bankr. E.D. Wis. 1986); *In re Horton*, 372 B.R. 349 (Bankr. W.D. Ky. 2007). Under these circumstances, the exception to discharge under section 523(a)(2)(A) does not apply. The Debtor is entitled to Judgment on Count I of the amended complaint.

This Opinion constitutes this Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure. A separate judgment order will be entered.

# # #